*Besaw v. Giroux*, No. 392-5-16 Cncv (Mello, J., Nov. 16, 2017).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

Vermont Superior Court
Chittenden Unit
Civil Division

ANNETTE M. BESAW, TRUSTEE,
 Plaintiff

v.                                                                    Docket No. 392-5-16 Cncv

BRYAN R. GIROUX,
 Defendant

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is an action by Plaintiff Annette M. Besaw, Trustee of the Revocable Living Trust of Ernest P. Giroux, to enforce an alleged security interest in 50 shares of the corporate stock of Champlain Bridge Marina, Inc. Plaintiff seeks an order from this court compelling Defendant Bryan R. Giroux to deliver Stock Certificate No. 9 to the Plaintiff, together with an award of attorney's fees and costs.

Presently before the court is Defendant's motion for summary judgment. Defendant contends that he is entitled to summary judgment in his favor for either or both of the following reasons: because Plaintiff's claim is barred by the applicable statute of limitations; and/or because Plaintiff failed to perfect any security interest in the claimed collateral and, therefore, has no claim against any stock owned by the Defendant. Plaintiff opposes the motion. Joseph D. Fallon, Esq. represents Plaintiff. James W. Runcie, Esq. represents Defendant. The following facts appear to be undisputed.

Undisputed Material Facts

The Champlain Bridge Marina, Inc. ("the Marina") is a Vermont corporation located in Addison, Vermont. The business was started in 1987 by Ernest P. Giroux and his son Raymond Giroux. It was incorporated on May 19, 1987, at which time 100 shares of stock were issued, 50 to Ernest and 50 to Raymond.

For many years Ernest and Raymond operated the Marina together. In late 1998, however, Ernest decided to sell his 50 shares of stock in the Marina to Raymond, and Raymond agreed to pay Ernest $272,000 for the shares. The parties documented the transaction with a Secured Promissory Note dated December 30, 1998, under which Raymond promised to pay Ernest $272,000 over time with interest. Raymond also signed a "Security Agreement (Chattel Mortgage)," granting Ernest "a security interest in, and mortgages to" collateral consisting of "50

Shares of stock of Champlain Bridge Marina, Inc.," to secure payment of the $272,000 indebtedness.

On January 7, 1999, Ernest transferred Stock Certificate No. 2, representing his 50 original shares of stock, to Raymond, as part of the stock sale. That same day, Raymond cancelled Ernest's Stock Certificate No. 2 and issued a new Stock Certificate No. 5 putting Ernest's 50 shares of stock in his name and that of his wife Francine as tenants by the entirety. As a result of these transactions, Raymond remained the sole owner of 50 shares of the Marina's stock, and he and Francine became the sole owners of record of the Marina's other 50 shares of stock. Raymond and Francine also had sole possession of the only two stock certificates that the corporation had outstanding at the time.

Shortly after the sale, Ernest assigned his rights under Raymond's Secured Promissory Note and "Security Agreement (Chattel Mortgage)" to the Ernest P. Giroux Revocable Living Trust. He also filed a UCC Financing Statement, recording his trust's security interest in the 50 shares of stock, with the Secretary of State in the spring of 1999. Ernest never filed a UCC continuation statement with the Secretary of State, however; consequently, the 1999 Financing Statement lapsed after five years.

In January of 2004, Bryan Giroux, Raymond's son (and Ernest's grandson), became the manager and operator of the Marina, with complete charge of all routine operations.

On July 30, 2005, Raymond and Francine cancelled Stock Certificate No. 5 and issued a new Stock Certificate No. 9 transferring to their son Bryan the 50 shares of stock that had belonged to Ernest. The following sentence appears in the Marina's stock register relating to this transfer: "Ernest and Theresa Giroux insisted this transfer to be done, with Chattel mortgage to E. P. Giroux." On the face of Stock Certificate No. 9 appears the following words written in handwriting: "This Certificate is subject to a chattel mortgage to E. P. Giroux."[1]

Ernest died on March 30, 2007, and his daughter Annette Besaw (Raymond's sister) became a trustee of Ernest's trust. On April 10, 2007, the day of Ernest's funeral, Raymond approached Annette and advised her that he owed her father's estate a substantial sum of money, but that the estate should not bother trying to collect it because it would not be able to. Raymond further advised Annette that he had put stock in his son Bryan's name so that the estate would get nothing, and if the estate tried to sue Bryan for what it was owed, Bryan had nothing in his name, so the estate would not get paid. Annette asserts in an affidavit that Raymond did not divulge to her, in this conversation, what amount of stock had been transferred to Bryan or whether the stock which had been transferred was subject to the Security Agreement that Raymond had signed and delivered to Ernest.

Raymond never made any payments towards the $272,000 indebtedness referred to in the Secured Promissory Note. Therefore, on September 11, 2008, Annette's attorney sent a letter to Raymond demanding that he pay the amount owed in full. Raymond failed to make any payments, so on October 7, 2013, Annette sued Raymond to collect the sums due under the Note.

---

[1] Notwithstanding the handwriting on the face of Stock Certificate No. 5, Bryan alleges that he never learned of any claim of a lien on, or security interest in his shares of stock until late 2014.

During the course of the collection suit against Raymond, Annette's attorney obtained a copy of the Marina's corporate records from Raymond in discovery. Annette's attorney received them on or about April 26, 2014 Annette asserts in an affidavit that it was not until her receipt of these records in discovery that she learned "that the stock issued to Bryan Giroux was conveyed subject to the Chattel Mortgage given to her father, Ernest Giroux, by Raymond Giroux."

On March 30, 2015, Hon. Helen M. Toor, Superior Judge, entered judgment in favor of Annette, ordering Raymond to pay the trust $540,453,15, comprising the $272,000 owed on the Secured Promissory Note plus prejudgment interest, attorney's fees and costs.

On April 30, 2015, Annette's attorney sent a letter to Bryan Giroux, stating, among other things, the following: "Pursuant to the terms of the Security Agreement, demand is hereby made that you deliver to this office original Share Certificate # 9 for 50 shares of stock in Champlain Bridge Marina, Inc." Bryan never honored Annette's demand that he turn over his Stock Certificate No. 9. She commenced this suit against him on May 10, 2016.

On October 5, 2016, Annette's attorney filed with the Secretary of State a new Financing Statement listing Bryan Giroux as the Debtor and the Ernest P. Giroux Trust as the Secured Party under the Security Agreement. Brian Giroux had never signed any document authorizing Annette or the Trust to file a Financing Statement identifying him as Debtor.

In the "Security Agreement (Chattel Mortgage)" that Raymond signed and delivered to Ernest, Raymond warranted, covenanted and agreed: "[t]o pay and perform all of the obligations secured by this agreement according to their terms" and "[t]o retain possession of the collateral during the existence of this agreement and not sell, exchange, assign, loan, deliver, lease, mortgage or otherwise dispose of same without the written consent of the Secured Party."

The "Security Agreement (Chattel Mortgage)" contained the following general provisions, among others: "[w]aiver of or acquiescence in any default by the Debtor, or failure of the Secured Party to insist upon strict performance by the Debtor of any warranties or agreements in this security agreement, shall not constitute a waiver of any subsequent or other default or failure;" and "[t]he Uniform Commercial Code shall govern the rights, duties and remedies of the parties…."

Under the Security Agreement, "Default" was defined to include the following: "[f]ailure to pay the Note in accordance with its terms;" "[f]ailure by Debtor to comply with or perform any provision of this agreement;' and [a]ny reduction in the value of the collateral or any act of the Debtor which imperils the prospect of full performance or satisfaction of the Debtor's obligations herein."

The "Security Agreement (Chattel Mortgage)" continued the following provision regarding remedies on default: "Upon any default of the Debtor and at the option of the Secured Party, the obligations secured by this agreement shall immediately become due and payable in full without notice or demand and the Secured Party shall have all the rights, remedies and privileges with respect to repossession, retention and sale of the collateral and disposition of the

3

proceeds as are accorded to a Secured Party by the applicable sections of the Uniform Commercial Code respecting 'Default', in effect as of the date of this Security Agreement."

Under the Secured Promissory Note, the following were defined as constituting events of "Default": "[f]ailure to pay the principal, interest, penalty and other fees at the maturity date established herein;" "[f]ailure to repay the 'overdue balance' and 'penalty' in accordance with the provisions set forth in Paragraph 5c";[2] and "[d]efault under any instrument constituting, or under any agreement relating to, the collateral."[3]

## Discussion

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See H&E Equip. Servs., Inc. c. Cassani Elec., Inc., 2017 VT 17, ¶ 10; V.R.C.P. 56(a). The non-moving party is entitled to "the benefit of all reasonable doubts and inferences." Campbell v. Stafford, 2011 VT 11, ¶ 10, 189 Vt. 567 (quotation omitted). In addition, "[s]ummary judgment is not a substitute for a determination on the merits, so long as evidence has been presented which creates an issue of material fact, no matter what view the court may take of the relative weight of that evidence." Fritzeen v. Trudell Consulting Engineers, Inc., 170 Vt. 632, 633 (2000) (mem.).

### Statute of Limitations

Bryan contends that Annette's suit is barred by 12 V.S.A. § 511, which provides that "[a] civil action, … except as otherwise provided, shall be commenced within six years after the cause of action accrues and not thereafter." Because the Secured Promissory Note and the Security Agreement expressly provided that a breach of one document constituted a breach of both documents, Brian argues that Annette's cause or causes of action under the Security Agreement would have accrued whenever Raymond breached the Promissory Note or the Security Agreement. Bryan claims that there were three such breaches: (1) when Raymond failed to make the payment that became due under the Note on January 1, 2001; (2) when Raymond transferred Ernest's 50 shares of stock to Bryan on July 30, 2005; and (3) when Raymond received and ignored Annette's letter of September 11, 2008, demanding payment in full of the amounts he owed under the Note. Annette did not commence this suit within six years after the date of any of these breaches. Therefore, Bryan contends that he is entitled to judgment in his favor as a matter of law.

Annette denies Bryan's contentions. Because Raymond signed the Secured Promissory Note in the presence of an attesting witness, Annette points out that a suit under the Promissory Note is subject to the 14-year statute of limitations set forth in 12 V.S.A. § 508, a contention that Bryan does not dispute. Annette argues that, because the Promissory Note and the Security

---

[2] Paragraph 5c of the Note required Raymond to pay any overdue balance and penalty within one year of the date the overdue balance and penalty were established.

[3] By virtue of Paragraph 10 of the Note, the terms and conditions of the Security Agreement were incorporated into and made part of the Note by reference. Paragraph 10 added: "Any default of Borrower under the terms of the Security Agreement shall constitute a default under this Secured Promissory Note."

Agreement were signed at the same time, and because the Note expressly incorporated the Security Agreement by reference, § 508's 14-year statute of limitations applies not only to a suit under the Note but also to a suit under the Security Agreement. Annette filed this suit against Bryan within 14 years of Raymond's second and third breaches. Therefore, she argues that her suit is not time barred. In the alternative, if the six-year statute applies, Annette contends that her suit against Bryan is still not barred because she commenced this suit within six years of her discovery in April of 2014 that Raymond's transfer of stock to Bryan had been made expressly subject to Ernest's Security Agreement.

Under Vermont's general statute of limitations for civil actions, 12 V.S.A. § 511, a civil suit will be barred if it is not commenced within six years after the cause of action accrued, unless some other statute provides for a longer limitation period. No other statute addresses the time limit for suits to enforce a security interest in shares of corporate stock. The parties acknowledge, however, that 12 V.S.A. § 508's 14-year limitations period applies to any suit against Raymond for breach of the Promissory Note. Annette's argument, that the same 14-year limitation period should apply to her suit against Bryan to enforce the Security Agreement, has some superficial appeal. Because the Note and the Security Agreement were signed together, and because the Note expressly incorporates the Security Agreement by reference, it would seem reasonable to read the Note and the Security Agreement as one document subject to one 14-year statute of limitations.

Unfortunately for Annette, however, the Vermont Supreme Court has rejected that very argument and has held that "a promissory note and a mortgage are individually governed by different statutes of limitations…." Huntington v. McCarty, 174 Vt. 69, 70 (2002); see, also, Houghton, Admr. V. Tolman, 74 Vt. 467, 469 (1902). Huntington dealt with a promissory note that was secured by a mortgage on land rather than a by security interest in shares of stock, but that is a factual distinction without any legal significance. It also makes no difference that in Huntington, the statute of limitations on the mortgage was longer than the statute of limitations on the note, whereas here the opposite is true. Huntington requires that the Note and the Security Agreement be viewed as separate agreements having their own separate statutes of limitations, even though the parties intended the agreements to go together. Therefore, Annette cannot rely on the Note's 14-year limitation period to save her suit under the Security Agreement.

Annette argues in the alternative that her suit against Bryan under the Security Agreement is not barred, even if the six-year limitation period applies, because a cause of action under 12 V.S.A. § 511 does not accrue until a plaintiff discovers the breach, and she did not discover Raymond's 2005 transfer of Ernest's stock to Bryan until she received the corporate records from Raymond in April of 2014. Because she brought this suit within six years of that discovery, Annette argues that this suit against Bryan is not barred by 511.

Bryan agrees that the six-year time limit in § 511 could not begin to run until Annette discovered that she had a cause of action against him, but Bryan contends that Annette discovered all she needed to know in April of 2007, when Annette learned at Ernest's funeral that Raymond had transferred Ernest's stock to Bryan in 2005 in violation of the Security Agreement. Because Annette did not file this suit within six years of April 2007, Bryan contends that her suit is still barred, despite the discovery rule.

5

As noted earlier, § 511 requires that a civil action be commenced "within six years after the cause of action accrues." A cause of action accrues for purposes of § 511 when the plaintiff discovers, or in the exercise of reasonable diligence, should have discovered both the fact of his or her injury and its cause. University of Vermont v. W.R. Grace & Co., 152 Vt. 287, 290-92 (1989). The parties disagree over which of the foregoing two dates should be treated as the date of discovery. The court does not need to resolve that disagreement, however, because, for purposes of § 511, it does not matter whether Annette discovered the 2005 transfer in 2007, 2014, or some other date. This is because Annette has no viable cause of action arising out of the 2005 stock transfer.

It is undisputed that Ernest consented to Raymond's 2005 transfer of stock to Bryan; indeed, the corporation's stock register records that Ernest and his wife "insisted this transfer be done," so long as the 50 shares remained subject to Ernest's security interest. Because Ernest consented to the transfer, Annette could not treat it as a breach of the Security Agreement, even if she first learned of it today. Therefore, if § 511's six-year limitation applied to this suit, the discovery rule would not save it.[4]

The court concludes, however, that this suit is governed not by § 511 but by § 507, which provides that "[a]ctions on specialties shall be brought within eight years after the cause of action accrues, and not after." A "specialty" is "a writing sealed and delivered – a contract under seal." McAllister v. Northern Oil Co., Inc., 115 Vt. 465, 467 (1949). While, under the common law, a seal had to be of wax or some other substance that would take an impression, such antiquated requirements have been relaxed over time. See, for example, 1 V.S.A. § 134 ("When the private seal of a person … is required on an instrument or writing to make such instrument or writing legal and valid, such seal shall consist of an impression … or the word 'seal' or the letters 'L.S.' opposite the signature."). Immediately above Raymond Giroux's signature on the Security Agreement appear the words, "In Witness Whereof, the Parties have respectively signed and sealed these presents the day and year first above written." Hence, the parties intended the Security Agreement to serve as a sealed contract.

It appears that Annette's suit against Bryan was filed within § 507's eight-year deadline. This is because Annette's suit was filed within eight years of Raymond's receipt and failure to comply with her letter of September 11, 2008, demanding that he pay the full amount owed under the Note. Raymond's failure to pay breached both the Note and the Security Agreement, and his breach entitled Annette to file suit against Bryan to enforce the Security Agreement. Under § 507, Annette had until September 11, 2016 (i.e., eight years from September 11, 2008)

_____

[4] Annette argues that, when Raymond told her in April of 2007 that she should not bother to sue him for the money he owed under the Promissory Note because "he had put stock in his son Bryan's name so that the estate would get nothing," he fraudulently concealed from her the fact that his 2005 stock transfer to Bryan had been expressly made subject to the Security Agreement. Annette argues that, as a consequence of this fraudulent concealment, the running of the statute of limitations was tolled pursuant to 12 V.S.A. § 555 from 2007 until 2014, when she learned the full truth of the matter. If that seven-year tolling period is excluded from the calculation, Annette claims that she filed her suit within § 511's six-year deadline. The problem with Annette's argument, however, is that she is seeking to sue Bryan, but it was Raymond whom she claims committed the fraudulent concealment. The tolling provision of § 555 only applies if the person who commits the fraud is the same person as the defrauded party is seeking to sue. That is not the case here.

6

within which to file her suit. She filed it on May 10, 2016. Therefore, this suit is not barred by the applicable statute of limitations. Bryan's motion for summary judgment on his statute of limitations defense must be denied.

Enforceability of the Security Agreement

Bryan contends that Annette cannot seek to enforce the Security Agreement against his 50 shares of stock in the Marina because the financing statement that Ernest filed with the Secretary of State in 1999 expired five years later in 2004, when Ernest failed to file a continuation statement. Therefore, by the time Bryan acquired the 50 shares from Raymond in 2005, Ernest's perfected security interest in the stock had lapsed. Because the security interest was unperfected when he acquired the stock, Bryan claims that the Security Agreement cannot be enforced against him.[5]

Annette denies Bryan's contention. Annette does not dispute the fact that Ernest's financing statement lapsed in 2004, but she contends that this is irrelevant because Bryan was on notice that the stock was being transferred to him subject to the Security Agreement. She concludes, therefore, that the Security Agreement can be enforced against Bryan, despite the fact that the Trust's security interest was unperfected at the time Bryan acquired the shares.[6]

Under the Uniform Commercial Code, a security interest in shares of corporate stock may be perfected either by taking physical possession of the stock certificate or by filing a valid financing statement with the Secretary of State. See 9A V.S.A. §§ 9-310-9-313. Here, neither Ernest nor Annette ever took physical possession of Stock Certificate No. 9. Ernest instead chose to perfect his security interest by filing a financing statement with the Secretary of State.

When the security interest is perfected by filing, the Code provides that the "filed financing statement is effective for a period of five years after the date of filing." Id. § 9-515(a). If the secured party fails to file a continuation statement at the conclusion of that five-year period, "the effectiveness of [the] filed financing statement lapses…." Id. § 9-515(c). The Code explains the effect of a lapsed financing statement as follows:

> Upon lapse, a financing statement ceases to be effective and any security interest … that was perfected by the financing statement becomes unperfected…. If the

---

[5] At noted in footnote 1, above, Bryan also alleges that he never learned of any claim of a lien on, or security interest in his shares of stock until late 2014. Because Bryan's allegation is disputed by Annette, the court could not grant summary judgment in Bryan's favor, based upon his allegation, even if the court found the allegation to be material. See V.R.C.P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). For reasons that will be explained later in this decision, however, the court concludes that Bryan's allegation, that he lacked actual knowledge of the security interest, is immaterial because he was on notice of its existence at the time he acquired the stock.

[6] In a footnote, Annette also suggests that, if a valid financing statement needs to be in place in order for her to enforce the Security Agreement against Bryan at this time, the financing statement that she filed with the Secretary of State on October 5, 2016, listing Bryan as the "Debtor," satisfies that requirement, a contention that Bryan disputes. Because the court concludes that the trust's security interest can be enforced against Bryan for reasons unrelated to Annette's filing of October 5, 2016, the court does not need to address this issue.

> security interest … becomes unperfected upon lapse, it is deemed never to have
> been perfected as against a purchaser of the collateral for value.

Id. Neither Ernest nor Annette ever filed a continuation statement with the Secretary of State. Therefore, the foregoing provisions of the Uniform Commercial Code support Bryan's contention that Ernest's 1999 financing statement lapsed and ceased to be effective, and the Trust's security interest became unperfected, in 2004, the year before Bryan acquired the 50 shares of stock in the Marina.

However, the foregoing provisions of the Code do not compel the conclusion that Annette cannot seek to enforce the Security Agreement against Bryan's 50 shares of stock in the Marina. Those Code provisions deal only with the question of prioritizing competing claims among secured creditors to the same collateral. A lien holder who allows its security interest to lapse and become unperfected runs the risk that another lien holder will perfect a security interest that will take a priority position over the same collateral. There is no evidence that that has occurred in this case.

What we have here is an instance where a third party (Bryan) acquired from a debtor (Raymond) collateral (Stock Certificate No. 9) that was subject to a Security Agreement in favor of a secured party (Annette), at a time when that party's security interest was unperfected. The Code provides that, in the absence of a statute to the contrary, security agreements are effective against purchasers of the collateral, and security interests are enforceable against third parties with respect to the collateral. See 9A V.S.A. § 9-201(a) ("Except as otherwise provided in this title, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors."); and Id. § 9-201(b) ("Except as otherwise provided … a security interest is enforceable against the debtor and third parties, with respect to the collateral … if: (1) value has been given; (2) the debtor has rights in the collateral….; and (3) … (A) the debtor has authenticated [i.e., signed] a security agreement that provides a description of the collateral…."). Thus, Annette's Security Agreement, and her security interest in the 50 shares of stock, are enforceable against Bryan, unless some other statute provides to the contrary.[7]

Several provisions of the Code describe the circumstances under which a third party can acquire collateralized shares of stock free and clear of the secured party's security interest. The first are 9A V.S.A. §§ 8-302 and 8-303. Section 8-302(a) and (b) provide that "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer" and "[a] purchaser of a limited interest acquires rights only to the extent of the interest purchased." Section 8-303(b) provides that a "protected purchaser … acquires its interest in the security free of any adverse claim."[8] An "adverse claim" would include a secured

---

[7] See also 9A V.S.A. § 315(a), which provides that, "[e]xcept as otherwise provided…: (1) a security interest … continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest … and (2) a security interest attaches to any identifiable proceeds of collateral."

[8] This provision is matched by 9A V.S.A. § 9-331(a), which provides that a "protected purchaser of a security … take[s] priority over an earlier security interest, even if perfected, to the extent provided in Article[] … 8 of this title."

party's security interest in the security.[9]  A "protected purchaser" is defined in § 8-303(a) to mean "a purchaser of a certified or uncertificated security, or of an interest therein, who:  (1) gives value; (2) does not have notice of any adverse claim to the security; and (3) obtains control of the certificated or uncertificated security."[10]  Section 8-105(d)(1) of the Code provides that "[a] purchaser of a certificated security has notice of an adverse claim if the security certificate: … whether in bearer or registered form, has been indorsed 'for collection' or 'for surrender' or for some other purpose not involving transfer…."

For several reasons, Bryan cannot rely on any of these provisions to defeat Annette's security interest in the 50 shares of stock, even though her security interest was unperfected at the time he acquired the shares.  First, Bryan did not pay value for the shares; they were a gift from his father.  9A V.S.A. § 1-204 (defining "value").  Second, Bryan could only acquire such rights to the stock as Raymond had to convey, and Raymond's rights were constrained by the Security Agreement that he had signed granting Ernest a security interest in the shares.  Third, at the time Bryan acquired the shares from his father, he was clearly on notice that the shares were subject to Ernest's Security Agreement; on the face of the stock certificate by which Bryan acquired the shares were written the words "This Certificate is subject to a chattel mortgage to E. P. Giroux."  Therefore, Bryan was not a protected purchaser of the 50 shares of stock, and Annette's security interest is enforceable against him with respect to those shares.  9A V.S.A. §§ 8-303(a) and 9-201(b).

Because there are material facts in dispute, and because those facts that are undisputed do not entitle Bryan to judgment as a matter of law, Bryan's motion for summary judgment must be denied.

Order

Defendant's motion for summary judgment is DENIED.

SO ORDERED this    16th day of November, 2017.

_____
Robert A. Mello
Superior Court Judge

---

[9] See 9A V.S.A. § 8-102(a)(1) defining "adverse claim" to mean "a claim that a claimant has a property interest in a financial asset [such as a security], and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset."

[10] Section 8-303 is matched by § 9-317(b), which provides:  "Except as otherwise provided … a buyer … of … a certificated security takes free of a security interest … if the buyer gives value and receives delivery of the collateral without knowledge of the security interest … and before it is perfected."